UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 99-10098-04-RGS

UNITED STATES OF AMERICA

v.

WILLIAM MERLINO

<u>MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR A NEW TRIAL</u>

November 21, 2007

STEARNS, D.J.

Defendant William Merlino (Merlino), together with three co-defendants,[1] was convicted of Hobbs Act and firearms offenses after enlisting in a conspiracy to rob a Loomis Fargo armored car facility in Easton, Massachusetts.[2]  Unbeknownst to the conspirators, one of their confidants was acting as an informant for the Federal Bureau of Investigation (FBI).  The conspirators were arrested in the early morning of February 7, 1999, the appointed day of the robbery, as they converged on the facility with an impressive arsenal of weapons, including handguns, an assault rifle, and a hand grenade, as well as a grab bag of highwaymen's accouterments - masks, gloves, bullet proof vests,

---

[1]Merlino's co-defendants were his uncle, Carmello Merlino (Carmello), David Turner (Turner), and Stephen Rosetti (Rosetti).

[2]All defendants were charged with conspiracy and attempt to violate the Hobbs Act, 18 U.S.C. § 1951, and with two counts of carrying or possessing a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c).  In addition, Turner and Rosetti were charged with being felons in possession of an explosive device and firearms in violation of 18 U.S.C. § 922(g)(1).

police scanners, a radio frequency detector, carry-away duffle bags, and escape vehicles.[3] On April 14, 1999, Attorney E. Peter Parker (Parker) undertook representation of Merlino pursuant to a Criminal Justice Act appointment. The case was tried over a five-week period in September and October of 2001.   Defendants were convicted on all counts of the Indictment. Merlino subsequently filed a motion for a new trial, asserting that his Sixth Amendment right to effective assistance of counsel was violated by Parker's mid-trial agreement with the United States Department of Justice (DOJ) to represent H. Paul Rico (Rico), a retired FBI agent, in an unrelated matter.   On July 26, 2007, the court denied Merlino's motion for a new trial indicating that a statement of the reasons for the denial would follow.   This is that statement.

BACKGROUND

Merlino and Parker agreed that their primary defense at trial would be that the FBI, acting through the informant, Anthony Romano (Romano), had inveigled Merlino into joining the Loomis Fargo conspiracy.   The theory of the defense was that Romano had entrapped Merlino, through persistent entreaties and fear tactics, in order to pressure Merlino's uncle, Carmello,[4] the architect of the conspiracy, into cooperating with the FBI. Carmello was believed by the FBI to possess information regarding the whereabouts of

---

[3]The underlying facts of the criminal conspiracy, which are not essential to this opinion, are set out in the First Circuit's decision on Turner's appeal.  See United States v. Turner, 501 F.3d 59, 63-65 (1st Cir. 2007).

[4]Carmello, who was sentenced to 570 months, died in prison while his appeal was pending.  Rosetti's sentence was remanded for reconsideration in light of the Supreme Court's intervening decision in United States v. Booker, 543 U.S. 220 (2005).  The court on remand reaffirmed the original sentence of 622 months.  Turner was sentenced to 460 months. Merlino received a sentence of 160 months.

priceless paintings stolen in a spectacular 1990 heist from the Isabella Stewart Gardener Museum.[5]  In addition, Parker and Merlino planned to "fold in[to]" their strategy Merlino's co-defendants' claim of outrageous government conduct.[6]  On October 5, 2001, mid-way through the trial, Parker contracted with the DOJ to represent Rico in a matter in which he was accused of the gravest kinds of official misconduct.[7]  In addition, on February 7, 2002, Parker agreed to represent Rico in an investigation being conducted by the House Committee on Government Reform into FBI mishandling of so-called "top-echelon" informants.  Neither Merlino nor the court was informed by Parker of his agreement to represent Rico.[8]

---

[5]Turner was thought by the FBI to have been part of the original Gardener Museum "crew."

[6]Prior to trial, the court held an evidentiary hearing on the outrageous government conduct claim.  During the course of that hearing, which lasted for five days, Attorney Parker cross-examined the two principal FBI agents involved in Merlino's case, Neil Cronin (Cronin) and David Nadolski (Nadolski).  Cronin, who was also the agent responsible for the investigation of the Gardener Museum robbery, testified that it was an accepted practice for the FBI to investigate and charge family members of a suspect in order to use the charges as leverage to pressure the suspect into cooperating.  At the close of the evidentiary hearing, the court indicated that "I am not so sure now that the issue is outrageous government misconduct . . . there is only one recorded case in all of the appellate history where an indictment was dismissed for outrageous government misconduct . . . from what I have heard over the last few days the issue really is an entrapment issue."  Tr. of October 25, 2000, at 98 to 101.

[7]The matter was McIntyre v. United States, Civil Action No. 01-10408, then pending before Judge Lindsay.  The case was a wrongful death action brought by the estate of a young man who had been murdered after his status as an FBI informant was leaked by an FBI agent to mobsters James Bulger and Stephen Flemmi.

[8]Both contracts between the DOJ and Parker stated: "You and Mr. Rico should be aware that by entering into this agreement, [the DOJ] in no way assumes responsibility on the part of the United States Government for any monetary liability that might be imposed against him in connection with this matter.  Although [the DOJ] has assumed responsibility

Merlino now claims that Parker unilaterally undertook a litigation strategy at trial that deviated radically from the one they had previously agreed upon -  to attack the government for its role in instigating the crime.  Specifically, Merlino claims that Parker: (1) conducted tepid cross-examinations of the government's witnesses; (2) failed to call as witnesses Romano's ex-wife and a private investigator who had taken a statement from her; and (3) prevented Merlino from testifying in his own defense.[9]

APPLICABLE LAW

The constitutional right to counsel carries with it a correlative right to representation free from any conflict of interest.  See Cuyler v. Sullivan, 446 U.S. 335, 345 (1980); Strickland v. Washington, 466 U.S. 668, 688 (1984).  The right is not, however, self-effectuating.  In Cuyler, the Court held that to establish a Sixth Amendment violation warranting a new trial, a defendant could not rely on any presumption of prejudice, but "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  Cuyler, 446 U.S. at 348.  The Court has since expanded on Cuyler by emphasizing that an "actual" conflict of interest must adversely affect counsel's

---

for remunerating you in the course of representing Mr. Rico to the extent specified in the addendum, your responsibility, of course, is solely to your client."

[9]After the trial, Merlino learned through the media that Parker had undertaken the representation of Rico.  Merlino learned that Parker was scheduled to accompany Rico to House Committee hearings in Washington, D.C.  Merlino was convinced that he was the victim of outrageous government conduct and FBI entrapment.  To have attention brought to his case, Merlino prepared a package of documents that he asked Parker to present to the House Committee.  Parker refused to do so, explaining that it would conflict with his representation of Rico.  Merlino argues that by choosing Rico's interests over his, Parker illustrated his bias in favor of Rico whenever their interests collided.

performance in the real world, as opposed to being "a mere theoretical division of loyalties." Mickens v. Taylor, 535 U.S. 162, 171 (2002).

"[I]n order to show an actual conflict of interest, a defendant must show that (1) the lawyer could have pursued a plausible alternative defense strategy or tactic and (2) the alternative strategy or tactic was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties." United States v. Soldevila-Lopez, 17 F.3d 480, 486 (1st Cir. 1994). See also Bucuvalas v. United States, 98 F.3d 652, 656 (1st Cir. 1996). It would appear that Merlino satisfies the first prong of the test because it was a "plausible (though likely unwise) alternative defense strategy" for Merlino to take the stand and proclaim his innocence, or possibly to call Mrs. Romano and the private investigator as impeachment witnesses. Reyes-Vejerano v. United States, 276 F.3d 94, 97 (1st Cir. 2002). Therefore, the question for the court is whether Parker declined to pursue such a strategy because of his divided loyalties. Id. at 98.

Parker invited the spectre of a potential conflict of interest by taking on the representation of Rico during Merlino's trial without giving notice to Merlino or the court. To be sure, Parker's contract with the DOJ made clear that Rico was his client, and not the government. Parker, nonetheless, knew that he would be compensated for his services by the government, and that the representation of Rico promised to be far more lucrative than anything that might be gleaned from the Merlino appointment.[10] He therefore opened

---

[10]Parker ultimately represented Rico in six separate lawsuits, in addition to the Congressional hearing.

himself to the argument that by presenting a strong defense on behalf of Merlino, he might jeopardize his prospects of receiving future favors from the government.

The determination of whether an attorney had an actual conflict that adversely affected his performance at trial is "intensely fact bound in nature.  The claim often turns on the precise details giving rise to the purported conflict, including what actions were taken by counsel, counsel's explanations for his conduct, and even counsel's (and perhaps defendant's) credibility."  Familia-Consoro v. United States, 160 F.3d 761, 765 (1st Cir. 1998).  A fair discharge of the court's obligation in this regard has required not only a hearing to permit Merlino to develop his claims, but also a review of the transcripts of the entire trial.

     1.  Cross-examination of the Government's Witnesses

Merlino claims that Parker's cross-examination of the FBI agents and Romano at trial was "anemic" in comparison to the "highly effective" and "surgical" examinations that he conducted during the evidentiary hearing on alleged outrageous government conduct. Merlino states that at trial, Parker spent a "minuscule" amount of time questioning the government's witnesses, as he asked no questions of Cronin and only the most "rudimentary and innocuous" questions of Nadolski.  According to Merlino, this sudden quiescence reflects a fatal lapse in Parker's representation - and a betrayal of Merlino.

On October 17, 2001, shortly after he had signed the contract with the DOJ, Parker cross-examined Nadolski.  Nadolski had already been relentlessly grilled by counsel for Merlino's co-defendants.  The issue of the Gardener heist had been fully aired; any further questioning by Parker on that issue would have been likely perceived by the court and the

jury as unduly repetitive.  At the hearing on the motion for a new trial, Parker testified that he in fact did not want to cross-examine Nadolski at all, because Nadolski had never mentioned Merlino during his direct examination.  (Parker's recollection is confirmed by the trial transcript).  Merlino states that he wanted Parker to elicit from Nadolski the testimony that he gave at the evidentiary hearing, to wit, that the FBI had no interest in Merlino prior to Romano's suggestion that he be recruited as a member of the "crew."[11]  Parker felt that it was more prudent to forego any questioning of Nadolski.  As Parker testified, "[i]t's always dangerous to give a witness who hasn't said anything about your client an opportunity to say something about your client."  Tr. of September 27, 2005, at 55. Nonetheless, Parker complied with Merlino's wishes.[12]  Although his cross-examination of Nadolski was brief, Parker elicited the statement that Merlino sought, that it was Romano who had taken the initiative in his recruitment.  Tr. of October 17, 2001, at 56-59.  With regard to Parker's decision not to question Cronin, it is crucial to note that the government did not call Cronin as part of its case-in-chief.  Rather, it was Turner who called Cronin after the government (and Merlino) had rested.  Cronin, like Nadolski, did not mention Merlino in his testimony.

Parker's approach to the questioning of Nadolski and Cronin cannot be gainsaid. Parker testified that it was critical to the trial strategy, which he and Merlino had

---

[11]How this testimony would have benefitted Merlino's defense that he was a victim of unlawful entrapment is somewhat difficult to fathom.

[12]Parker claims that Merlino agreed with his advice that he not testify on his own behalf after Parker agreed to ask certain questions of Nadolski and Cronin on cross-examination.  As will be discussed below, Merlino vigorously disputes that he ever agreed that it was not in his interest to testify.

developed, to set Merlino apart from the other defendants. Parker diligently sought to keep Merlino on the periphery of the conspiracy, portraying him as a "gopher" kept largely in the dark by the "big boys." This tactic might well have been undone if Parker had challenged the testimony (or lack thereof) of either of the FBI agents in a manner that might have focused them on Merlino. "[A]lthough a more aggressive cross-examination of [Nadolski and Romano] may have been a 'plausible' strategy, it was probably not superior to [Parker's] approach: in fact, [a] low-key cross-examination served [Merlino's] interests" by keeping the attention focused on the other crew members. United States v. Sotomayor-Vazquez, 249 F.3d 1, 15 (1st Cir. 2001).

The court has also reviewed Parker's lengthy and thorough cross-examination of Romano (the informant), which took place on October 4, 2001.[13]  See Tr. of that date, at 10-94. Parker elicited testimony from Romano that before Merlino was brought into the conspiracy, he was making every effort to remain drug-free and was "preaching" to others about the pitfalls of addiction. Romano testified that when he learned that Merlino was desperate for money, he suggested to Carmello that Merlino be approached. When Merlino did not appear for a planning meeting, Romano repeatedly paged him without receiving a response. Romano then called Merlino at his mother's home to encourage him to participate in a "recon" mission to case the Loomis Fargo facility. Parker also pursued the theory that Romano had entrapped Merlino by making a veiled threat that if Merlino

---

[13]Romano, the government's key witness, was on the stand for seven days.

backed out of the scheme, he would be killed.[14]  Finally, Romano was depicted by Parker to the jury as an untrustworthy and unsavory scoundrel with a long criminal record who was cooperating with the FBI solely to secure an "insurance policy" for his future crimes. In the court's view, Parker elicited from Romano testimony as favorable to Merlino as could have been hoped.  The portrait of Merlino that emerged through the cross-examination of Romano was that of a recovering addict in desperate straits trying to salvage something of his life, whose best efforts were foiled by the relentless and intimidating conduct of a ruthless government informant.   There is nothing in Parker's questioning of the government's witnesses that even remotely suggests that he adopted a spineless strategy at trial, let alone that his performance was in any way modulated or muted by his contract with the DOJ.

In general, the "evil" of conflict-ridden counsel "is in what the advocate finds himself compelled to *refrain* from doing."  Holloway v. Arkansas, 435 U.S. 475, 490-491 (1978) (emphasis supplied).   Parker did not refrain from asking critical questions of the government's witnesses, only foolish ones.  His approach to the examination of Nadolski and Romano was skillfull and aggressive and, in the case of Nadolski, carefully tailored to avoid the unnecessary infliction of collateral damage.  Counsel are granted a "wide latitude of discretion . . . to conduct the defense in the manner of his or her own choosing." Knight v. Spencer, 447 F.3d 6, 18 (1st Cir. 2006).   "[C]hoices in emphasis during cross-examination are prototypical examples of unchallengeable strategy."  Phoenix v.

---

[14]Romano told Merlino that  "once somebody gets told, we make a commitment or see you later, right?"

<u>Matesanz</u>, 233 F.3d 77, 83 (1st Cir. 2000). The decision not to question Cronin, who was in the wings throughout the trial and had not incriminated Merlino, was exactly what would have been expected of competent and experienced counsel. <u>Compare</u> <u>Ouber v. Guarino</u>, 293 F.3d 19, 33 (1st Cir. 2002) (actual conflict apparent from attorney's failure to subject the prosecution's case to any meaningful adversarial test whatsoever).

    2. <u>Failure to Call Defense Witnesses</u>

Merlino claims that Parker refused to call two "crucial" defense witnesses, Romano's ex-wife, Lorraine Romano (Lorraine), and Gil Lewis (Lewis), a private investigator, both of whom purportedly would have further undermined Romano's credibility. Two of Lorraine's alleged statements to Lewis are of particular interest to Merlino. First, Lorraine told Lewis that Romano had bragged to her that once the charges against Carmello and Rosetti were resolved, he would have more money than he had ever had in his life. Second, Lorraine told Lewis that Romano was often at his father's automotive shop when mobsters Francis Salemme and Stephen "The Rifleman" Flemmi (Flemmi) were present. Lorraine informed Lewis that Romano had instructed her that should Flemmi ever stop by her house, she should let him in.

Parker testified at the hearing on the motion for a new trial that while he was initially inclined to call Lorraine as a witness, he changed his mind after he retained a second investigator to re-interview her. In her statement to the second investigator, Lorraine repudiated all of the damaging statements that she had made to Lewis. In light of the recantation, Parker felt that there was an inordinate risk for Merlino in calling Lorraine to the stand. As Parker testified, had he called Lorraine, he would have had to "take the

chance on what she would say or not say, and then call Lewis if I thought I could get in through him what he was told." Tr. of September 27, 2005, at 51. Merlino for his part claims that the testimony of Lewis was necessary to corroborate the testimony of Lorraine, "and/or more crucially, to impeach her with her prior inconsistent statements in the event that she did not testify in accordance with" the statements she had given to Lewis during her initial interview.[15]

A defendant must show some "causal relationship between [the perceived conflict] and the alleged deficiency in representation." Reyes-Vejerano, 276 F.3d at 99. Although Merlino makes much of the purported connection between Romano and Flemmi (which he claims would have come to light had Lorraine testified), the court can find nothing in Parker's decision not to call Lorraine that is plausibly related to his representation of Rico.[16] Sound trial strategy counsels against calling a witness who is likely to be hostile, and who will therefore not offer testimony helpful to the defense.[17] As every litigator knows, "[t]he decision whether to call a particular witness is almost always strategic,

---

[15]Parker rightly anticipated that the court would have been unlikely to admit hearsay testimony to impeach a witness who had been unsuccessfully called solely to impeach Romano with the same hearsay.

[16]The argument supposes that the jury would have been familiar with Flemmi's reputation and would have drawn an "impeachment by association" inference as a result (which is unlikely), or that the court would have allowed Merlino to introduce extrinsic evidence of Flemmi's criminal background (which is even more unlikely).

[17]Additionally, although Merlino wished to discredit Romano through Lorraine's statements to Lewis that Romano was a thief, suffered from mental illness, and was a habitual liar who would do anything for drugs, this testimony (if Parker were able to elicit it from Lorraine despite her volte-face) was at best repetitive. All of these character deficits were explored by Parker during his cross-examination of Romano.

11

requiring a balancing of the benefits and risks of the anticipated testimony. The witness may not testify as anticipated, or the witness's demeanor or character may impress the jury unfavorably and taint the jury's perceptions of the accused." Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993) (internal citations omitted).

     3. Failure to Call Merlino

Finally, Merlino contends that Parker refused to let him testify in his own defense. Merlino states that the plan from the outset was for him to take the stand and testify as to how he was manipulated by Romano into joining the conspiracy, and how his fear of Romano and Flemmi kept him from abandoning the scheme. He claims that he would have testified that his fear stemmed from an incident in his childhood when several Boston police officers arrived at his home to inform his mother that her boyfriend, Hugh "Sonny" Shields (Shields), had been hospitalized after being ambushed in a mob-related attempted execution. The next day, Merlino and his family flew to California to take refuge with his aunt. Several months later, two FBI agents arrived at the aunt's home in California and informed the family that Flemmi had taken out a contract on Shields. Eventually, the family returned to Massachusetts and Shields went into hiding. Merlino claims to have a deep-rooted fear of Flemmi as a result.[18]

    Merlino's current counsel has attempted to draw a connection between Merlino's case and Parker's representation of Rico by asserting that Merlino was "chomping at the bit to testify about Stephen Flemmi and Rico's involvement with Stephen Flemmi." Tr. of

---

[18]The court, which sentenced Flemmi to life in prison on January 27, 2004, notes that by the time the Loomis Fargo conspiracy matured, Flemmi had been incarcerated on various charges, including murder.

September 27, 2005, at 70.  However, the assertion is a wild distortion.  There is nothing in the record that even remotely suggests that Merlino knew of or would have had anything to say about Rico's relationship with Flemmi.[19]  Merlino's argument is that had he testified to his fear of Flemmi's criminality, that would have raised a conflict with Parker's duty to Rico, because Rico had been Flemmi's informant handler in the 1960's.  This argument, to the extent it can be parsed, strains credulity.  The court cannot fathom the logical connection that translates Merlino's fear of Flemmi's criminality (however justified) into an aspersion on Rico (who was dealing with Flemmi as an informant precisely because he was a notorious criminal).  Merlino additionally argues that one of Parker's objectives as counsel for Rico was to defuse Rico's relationship with Flemmi.  That is certainly true, but it has no bearing on Parker's role in Merlino's case.  This is simply not a case in which Parker's "struggle to serve two masters cannot seriously be doubted." Glasser v. United States, 315 U.S. 60, 75 (1942).

Parker freely admits that Merlino was adamant in his desire to testify in his own defense, and that he was equally adamant in his efforts to dissuade Merlino from testifying. Parker stated that he had little faith in Merlino's ability to make a positive impression on the jury.  He felt that the case had gone in well, and that he could make an effective argument on Merlino's behalf from the existing evidence, supported by the testimony of Merlino's mother and drug counselor,[20] rather than take the risk that Merlino would exhibit

---

[19]Of more importance, it is difficult to discern the relevance of the relationship to Merlino's initial decision to join the conspiracy.

[20]Merlino's mother testified that after Merlino received a telephone call from Romano while at her home, he appeared visibly nervous.  His counselor testified that he was clean

frustration or anger on the witness stand. Merlino's counselor told Parker that she did not believe that the courtroom would provide Merlino with an effective forum. Merlino concedes that Parker shared with him the concern that he would make a poor witness. Merlino, however, states that he was "more concerned with the truth" than with the jury's assessment of his demeanor. Tr. of September 27, 2005, at 112. Parker insists that Merlino made the ultimate decision not to testify. Merlino, for his part, claims that until the moment Parker rested at trial, he had no indication that he would not be called as a witness. He states that although Parker and his mother had advised him (strenuously) not to testify, he had never agreed not to do so.[21]

The court finds the testimony of Parker, that Merlino made the ultimate decision not to testify, to be the more credible. Had Merlino testified, apart from demeanor issues, he would have been impeached with his criminal record, and would have been questioned about his knowledge of the conspirators' plan to arm themselves with heavy weapons, including the hand grenade, questioning that in the court's retrospective judgment would have made entry of a judgment notwithstanding the verdict on the hand grenade

---

and sober at the time that he was induced into joining the conspiracy.

[21]At the new trial hearing, there was discussion of a "blow-out" between Parker and Merlino during a joint meeting among all defendants and their counsel. While Merlino testified that the argument took place after Parker rested, and was caused by Merlino's anger at not being called as a witness, it was Parker's recollection that the argument took place before the government rested, and was attributable to Parker's reluctance to call Lorraine. Regardless of the timing, the very fact of the "blowout," as portrayed by Merlino, strongly suggests that he knew that he had the right to testify. Merlino never complained to the court that he was being prevented from testifying.

14

possession count virtually impossible.[22]   In the court's view, had Merlino testified on his own behalf, he would have "offered himself up to a cross-examinational meat-grinder on virtually every relevant issue."   Bucuvalas, 98 F.3d at 656-657.

A review of the transcript of the trial, as well as Parker's and Merlino's testimony at the evidentiary hearing, leads the court to the conclusion that Parker did not labor under an actual conflict of interest.   The court must presume that, unless it is proven otherwise, a lawyer ordinarily "will subordinate his pecuniary interests and honor his primary professional responsibility to his clients."   Bucuvalas, 98 F.3d at 656, quoting United States v. DiCarlo, 575 F.2d 952, 957 (1st Cir. 1978).   Here, Merlino has not shown otherwise.   It simply cannot be said that Parker was "influenced in his basic strategic decisions by the interests of [the DOJ], who hired him."   Wood v. Georgia, 450 U.S. 261, 272 (1981).

Merlino relies on United States v. Schwarz, 283 F.3d 76 (2d Cir. 2002), a case in which the court found a conflict of interest based on counsel's simultaneous representation of a defendant police officer in a criminal matter, and his representation of the police officers' union (PBA) and its president in a related civil matter.   In Schwarz, the PBA paid counsel's legal fees to represent the defendant, who was charged with sexually assaulting

---

[22]After trial, Parker successfully argued a motion on Merlino's behalf for a judgment notwithstanding the verdict on his conviction for the constructive possession of a hand grenade.   Pursuant to 18 U.S.C. § 924(c), Merlino was subject to a mandatory minimum sentence of thirty (30) years, from and after any other sentence imposed by the court on the other counts of conviction.   Based on the quality of Parker's argument, the court granted the motion and vacated the conviction.   Consequently, Merlino's sentence was reduced to thirteen years and four months, while his co-defendants received sentences three and four times longer.   Merlino's brief against Parker may fall within the category of a good deed that cannot go unpunished.

a detainee.  See id. at 81.  The PBA subsequently entered into a two-year, $10 million general retainer agreement with the same attorney.  Id.  The attorney then began to represent the PBA and its president in a related civil matter, in which it was alleged that the PBA had participated in a conspiracy to injure the victim and to cover up the assault. On appeal, the court held that there was a conflict because the PBA's interests in defending the civil lawsuit diverged from defendant's interests in pursuing a particular defense.  See id. at 91.  The court found that counsel had foregone not just a "plausible" alternative defense strategy – but a "compelling" alternative strategy that could have created a reasonable doubt in juror's minds.  Id. at 92-93.  Here, Merlino can make no such showing.  The defense strategy in Merlino's case was entrapment, and Parker pursued that strategy to the fullest extent permitted by the court.

A coda illustrating the zeal Parker brought to his defense of Merlino (and his adherence to the agreed strategy of putting the government on trial) is found in his closing argument.  Parker forcefully told the jury that "Billy Merlino was entrapped by the government in this case, and you should acquit him for that reason."  Tr. of October 22, 2001, at 137.  Parker repeatedly stated that as an FBI informant, Romano "equals the government."  Id. at 138.  He intoned that "Romano, the government's secret informant, sank his fangs into Billy and made sure Billy had no choice but to succumb."  Id. at 162-163.  Finally, he excoriated the government when he stated that "[t]he government unlawfully induced Billy Merlino to commit a crime and then prosecuted him in this courtroom for it.  That's what we know."  Id. at 144.  If Parker was in the thralls of the

16

government and burdened in his defense of Merlino as a result, no one hearing the closing

argument would have had the faintest clue.

<u>ORDER</u>

For the foregoing reasons, as the court has previously ruled, the motion for a new

trial is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE