UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 99-10098-RGS

UNITED STATES OF AMERICA

v.

WILLIAM MERLINO

MEMORANDUM AND ORDER ON
PETITIONER'S MOTION TO VACATE,
SET ASIDE, OR CORRECT SENTENCE

February 28, 2014

STEARNS, D.J.

In the winter of 1998, at the onset of the events that led to this motion, William Merlino was a troubled young man with a drug-induced criminal record fueled by a desperate addiction to heroin, and grieving the death of his wife who had died of a heart condition while he was serving a drug-related House of Correction sentence. Among William Merlino's many poor life choices, two in particular stand out in the present context. The first was the decision to succumb to the blandishments of his uncle Carmello Merlino and one Anthony Romano, a purported henchman who, unbeknownst to either of the Merlinos, was an FBI informant. William Merlino agreed in essence to act as a gopher in the robbery of a Loomis Fargo armored car facility in Easton, Massachusetts. To ensure the success of the robbery, Carmello Merlino had gathered an experienced crew, including felons Stephen Rossetti and David Turner, and had assembled a formidable arsenal of weapons, among them

semi-automatic pistols and fatefully, hand grenades. With Romano's help, Carmello Merlino had also recruited an "insider" at Loomis Fargo to ease the entry of the robbers in the early morning hours of February 7, 1999. A critical weakness of the planned heist stemmed from the fact that the "insider" was an invention of Romano, with the assistance of the FBI, which had dangled the Loomis robbery as part of a sting operation targeted at Carmello Merlino and David Turner.[1] The four defendants who went to trial, including William Merlino, were each convicted of conspiracy and the attempt to violate the Hobbs Act, 18 U.S.C. § 1951, and two counts of possessing firearms during and in relation to a crime of violence, 18 U.S.C. § 924(c), including the grenades. All received lengthy sentences after motions for a new trial or judgment of acquittal were denied with one exception. The exception was in the case of William Merlino and the grenade count of the indictment.

In entering a judgment of acquittal in William Merlino's favor on this count, the court explained as follows.

> This motion raises a troubling issue. The only evidence that William Merlino was aware that hand grenades would be used in the commission of the robbery came from Romano's testimony about the January 28, 1999 planning meeting. To place the testimony in context, it is important to understand some aspects of William Merlino's background. William Merlino is Carmello Merlino's nephew. He is a recovering heroin addict with a record of petty crimes, mostly involving theft, that are consistent with the profile of an inveterate drug user. Unlike the other defendants,

---

[1] The two men were believed to possess information about (or to have participated in) the notorious robbery of artwork from the Isabella Stewart Gardner Museum.

William Merlino had no involvement in the hardened crimes of his uncle's usual criminal associates. By all accounts, he was deeply affected by the recent death of his wife and was peculiarly susceptible to the influence of his domineering uncle. His role in the conspiracy was essentially that of a gopher. Indeed, on the night of the critical meeting, William Merlino was sent out from time to time to collect accessories (hockey bags and masks) to be used in the robbery.

The critical testimony consists of the following exchange between Romano and the Assistant United States Attorney regarding the conspirators' meeting on the night before the robbery.

> Q. During that discussion [of the final plan], were there any periods of time when any of those four individuals left the room?
>
> A. We were separated in the building for a while.
>
> Q. Was that before or after the discussion about the final plan?
>
> A. Both times.
>
> Q. During the time—at the end when you were discussing the weapons, the equipment, the plan in terms of where people were going to go when, were there any periods of time when any of the four people left the group?
>
> A. I don't recall. I think we split up a couple of times.
>
> Q. During the discussion of the plan when Stephen Rossetti told the group that he had guns and grenades, who else was present in the room at that time?
>
> A. Everybody was there.

As William Merlino's counsel succinctly states: "Three decades in jail ride on those three words." It is, of course, a long-standing rule that a conviction can rest on the uncorroborated word of an informant witness, so long as the jury is fully apprized of any agreements that he has reached with the government, and so long as the court gives "complete and correct instructions detailing the special care the jury should take in assessing the testimony of the [informant]." *United States v. Ortiz-Arrigoitia,* 996 F.2d 436,

>438–439 (1st Cir.1993). All of that was done here, and in a purely legal sense, the verdict is unimpeachable. I have no particular reason to believe that Romano's testimony did not reflect his best efforts to accurately remember who was present when the critical words were spoken by Rossetti, nor do I doubt the credibility of his testimony on other important aspects of the case. Nonetheless, given Romano's admitted lapses of memory, and the lack of any contemporary documentation or other corroborating evidence of his testimony on this point, I am left with the nagging conviction that the unadorned statement "Everybody was there" is too slender a reed to support the mandatory thirty year consecutive sentence that the law otherwise requires as an addition to the substantial punishment that William Merlino will almost certainly receive.

*United States v. Merlino*, 204 F. Supp. 2d 83, 86-92 (D. Mass. 2002), *aff'd in part, rev'd in part and remanded*, 592 F.3d 22 (1st Cir. 2010).

Following the entry of the judgment of acquittal, on November 25, 2002, the court sentenced William Merlino to two concurrent 100-month sentences on counts one and two of the indictment and a 60-month consecutive sentence on count four (the firearms charge). William Merlino then made a second bad decision. Disregarding the court's advice, Merlino appealed his conviction, prompting, as the court predicted would happen, a cross-appeal by the government of the judgment of acquittal. After a series of procedural delays, on January 15, 2010, the First Circuit Court of Appeals issued its decision in *United States v. Merlino*, 592 F.3d 22 (1st Cir. 1010), rejecting Merlino's appeal and granting the government's appeal of the judgment of acquittal, thereby reinstating the mandatory 30-year sentence on the grenade count.[2]

---

[2] Ironically, Merlino had recently completed his original sentence (with credit for good behavior) when the Court of Appeals mandate issued. On March 11, 2011, the government agreed to a resentencing of Merlino to the

There matters stood (and would have remained), but for a sea change in the Supreme Court's ineffective assistance of counsel jurisprudence. On March 21, 2012, the Court issued decisions in the companion cases of *Missouri v. Frye*, 132 S. Ct. 1399 (2012), and *Lafler v. Cooper*, 132 S. Ct. 1376 (2012), collectively addressing a defendant's constitutional right to effective assistance of counsel during plea bargaining. After learning of these decisions, Merlino (who had been reincarcerated) contacted his current counsel, Federal Public Defender Judith Mizner, to inquire as to whether the file in his case included any record of an offer of a plea bargain by the government. Merlino related that he recalled then-Assistant United States Attorney (AUSA) James Lang (now a Superior Court Justice) stating at sentencing that the government had always viewed him as the least culpable of the defendants. Mizner in turn contacted Merlino's trial counsel, E. Peter Parker, in an effort to retrieve Parker's trial file. Parker located the file in his remote storage site on August 10, 2012.

In reviewing his handwritten notes, Parker found a page referencing a telephone call with AUSA Lang on August 23, 2001 (a few weeks prior to the trial), reflecting a discussion in which Lang proposed that Merlino plead guilty to Counts I and II of the indictment charging the Hobbs Act conspiracy and attempt and Count IV charging the carrying of a firearm in relation to a crime of violence. In return, the government would dismiss Count III charging the

---

thirty years with credit for the time he had meanwhile served.

carrying of a grenade in relation to a crime of violence (requiring a consecutive thirty-year mandatory minimum sentence). The notes further reflected a discussion in which the government suggested three approaches to sentencing, producing guideline ranges with low ends of 188, 190, and 211 months of incarceration. Parker found no reference to the plea discussion in his correspondence with Merlino. He states in an affidavit that he does not believe that he informed Merlino of the tentative plea offer. Merlino also avers that he was not informed of the plea possibility and that he would have accepted the offer if it had been communicated to him. Attorney Mizner then filed this petition seeking to vacate Merlino's conviction on Sixth Amendment effective assistance grounds and to reinstate the plea offer allegedly extended by the government prior to the trial.[3]

To succeed on a claim of ineffective assistance of counsel, a defendant must show that: (1) his counsel's performance fell below an objective standard of reasonableness; and (2) that prejudice resulted, such that the outcome of the proceeding would have been different but for counsel's unprofessional errors. *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984). In *Frye*, the Supreme Court held that "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," and that the failure to do so renders counsel's performance constitutionally deficient. *Frye,* 132 S. Ct. at 1408 (2012). To

---

[3] The government does not contest the timeliness of the peition.

6

establish prejudice from such deficient performance, a defendant "must demonstrate a reasonable probability [that he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel." *Id.* at 1409. A defendant must further "demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it . . . ." *Id.*

The First Circuit has not yet had the opportunity to define the types of prosecutorial communications that would constitute a "formal offer" of a plea agreement. District court decisions construing the term appear to largely rest on the unique facts of the case under consideration. A majority of courts, however, have held that a formal plea offer must consist of something more than preliminary oral communications. *See, e.g., United States v. Petters*, 2013 WL 6328544, at *3 (D. Minn. Dec. 5, 2013) (no formal plea offer where "there was no written offer from the Government, but rather only oral communications between counsel"); *Elem v. Ryan*, 2013 WL 5434579, at *20 (D. Ariz. Sept. 27, 2013) ("[A]lthough counsel may have engaged in plea discussions, Petitioner failed to show that the state ever extended a plea offer."); *Montgomery v. United States*, 2013 WL 6196554, at *4 (W.D. Ky. Nov. 26, 2013) (The Supreme Court "clearly intended to distinguish 'offers' made during the course of preliminary negotiations from those made once negotiations have concluded . . . . [T]here must at the very least be some basis for concluding that the alleged offer could have been accepted or rejected

without further discussion or negotiation."). *But see Greenspan v. Cate*, 2014 WL 197749, at *36 (S.D. Cal. Jan. 16, 2014) (indicating that verbal plea offers can, depending on their content, constitute formal offers).

In finding plea offers to lack the requisite formality, some courts have emphasized the prosecutor's lack of authority to bind the government. *See McIntosh v. United States*, 2013 WL 5567578, at *4 n.4 (N.D. Ill. Oct. 9, 2013) (an allegation that an assistant prosecutor proposed a plea was insufficient because "formal plea offers cannot be made without supervision by the leadership of the [District Attorney's] office."); *United States v. Waters*, 2013 WL 3949092, at *10 & n.3 (E.D. Pa. July 31, 2013) (no formal plea offer where the proposal was alleged to come from a district attorney without the authority to enter into a binding agreement and where there was no evidence of a written agreement, contrary to an office policy requiring that offers be in writing). *But see United States v. Polatis*, 2013 WL 1149842, at *9-11 (D. Utah Mar. 19, 2013) (treating a tentative plea offer contingent on the approval of a "Screening Committee" as a formal offer).

At least one court has demonstrated a willingness to adopt a broad view of *Frye* premised on the integral role of plea bargains in the criminal justice system. This view holds that "even if a firm offer is not conveyed to defense counsel, when the government indicates it is willing to negotiate a resolution in a case, defense counsel has a duty to engage in the negotiation process. Counsel can be constitutionally ineffective in the plea negotiation process if

they fail to convey to the defendant the government's articulated willingness to resolve a case by negotiation or [the government's] proposed [ ] resolution to the case." *Polatis*, 2013 WL 1149842, at *10 n.16.

Here, although AUSA Lang put forward the putative plea offer orally by telephone, Parker's notes suggest that the conversation went well beyond a mere inquiry about the willingness to enter plea negotiations. It appears that the discussion specified the counts of the indictment to which Merlino would plead guilty, and identified specific approaches to the sentencing guidelines tied to the resolution of each count, including the actual length of the resulting sentence.[4] Moreover, each of the approaches contemplated the dismissal of the grenade count at issue here. Thus, the communication between Lang and Parker may well be distinguishable from cases in which a formal offer was not found because the discussion in contractual terms had not gone beyond the state of imperfect negotiation. Here, the argument can be made (if Parker's notes are accurate) that all of the essential terms of a binding agreement were on the table. *See Merzbacher v. Shearing*, 706 F.3d 356, 368-370 (4th Cir. 2013) (no formal offer where plea discussion finalized only the length of sentence but not the counts to which defendant would plead); *Petters*, 2013 WL 6328544, at *3 (no discussion of the charges to which defendant would plead

---

[4] It should be recalled that in the pre-*Booker* era in which the discussion took place, the Sentencing Guidelines were virtually mandatory in their application, meaning that a calculation under the guidelines was more likely to lead to a predictable outcome than is generally the case today.

guilty). This case may be further distinguishable because it may be that both prosecutor and defense counsel believed the offer to carry the requisite level of formality. *See* Parker Aff. ¶ 10 ("My notes reflect that *Mr. Lang had indicated the government was willing* to dismiss the 924C hand grenade count if Mr. Merlino would agree to plead guilty to the Hobbs Act count and the five-year 924C gun count and to refrain from seeking any downward departures." (emphasis added)). *Compare Montgomery*, 2013 WL 6196554, at *4-5 (neither defense counsel or prosecutor believed that a formal plea offer had been made); *McIntosh*, 2013 WL 5567578, at *4 (same).

Because on the record before the court, a determination cannot be made as to whether the discussion between Lang and Parker had reached a sufficient level of formality to implicate the Sixth Amendment concerns expressed in *Frye*, the court will order an evidentiary hearing on that issue, which will require the testimony of Justice Lang[5] and Mr. Parker.[6]

## ORDER

The Clerk will schedule an evidentiary hearing at the convenience of the witnesses and present counsel.

---

[5] The court is sensitive to the demands placed on Justice Lang by his duties as a sitting Justice of the Superior Court and will do whatever is necessary to accommodate his schedule.

[6] Should this issue be resolved in Merlino's favor, the court will be required to make the additional finding that Merlino would have accepted the offer had it been conveyed to him. This may well require his personal testimony in a subsequent hearing.

10

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE