UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 99-10098

UNITED STATES OF AMERICA

v.

WILLIAM MERLINO

MEMORANDUM AND ORDER ON
PETITIONER'S MOTION TO VACATE,
SET ASIDE, OR CORRECT SENTENCE

June 11, 2015

STEARNS, D.J.

William Merlino seeks to reinstate a government plea offer that he alleges was never conveyed to him by his counsel. He claims that had he been made aware of the offer, he would have accepted it and not gone to trial, a lost opportunity that cost him years of his life.[1] This case squarely raises an issue with which the American criminal justice system has only recently begun to come to grips. As much pride as the American jury system justifiably inspires, in truth its impact on the disposition of most

---

[1] I suspect in the eyes of many criminal defendants, a jury trial is seen as more of a punishment enhancement than a forum for vindication given the significant reward the United States Sentencing Guidelines confer on those who plead guilty (or in the parlance of the Guidelines "accept responsibility"). In the typical case, the more or less automatic reduction in the Guidelines sentence in recognition of a plea is on the order of 25% or more.

1

criminal cases is relatively slight. In the most recent year for which reliable statistics are available (2013), 96.9 percent of all federal criminal cases were resolved by guilty pleas, and many of those pursuant to a formal contract (a plea bargain) between the defendant and the government.[3] *See* U.S. Sentencing Comm'n, Overview of Federal Criminal Cases, Fiscal Year 2013.

In recent years, decisions of the U.S. Supreme Court have come to acknowledge the normative reality of plea bargaining in the criminal justice system. In the first of these cases, *Padilla v. Kentucky*, 559 U.S. 356 (2010), the Court held that a lawful resident alien defendant was entitled to competent advice from his counsel on the collateral immigration consequences of a plea-bargained felony conviction. As Professor Stephanos Bibas of the University of Pennsylvania Law School has thoughtfully commented,

> [o]ne of the most important points in *Padilla* is not highlighted in the Court's opinion but largely implicit. Justice Stevens's majority opinion mentions only in passing that today, 95 percent of criminal convictions result from guilty pleas and only 5 percent result from trials. [*Padilla*, 559 U.S. at 372 and n.13.] Plea bargaining is no longer a negligible exception to the norm

---

[3] Although the court is not a party to the bargain, it is the unusual case in which the judge deviates in any material fashion from its negotiated terms.

2

> of trials; it is the norm.  Nor, given information deficits and pressures to bargain, can we simply trust in an efficient plea market that reflects full information about expected trial outcomes.  Thus, plea bargaining needs tailored regulation in its own right, not simply a series of waivers of trial rights.
>
> . . .
>
> Since *Padilla*, the Supreme Court has reiterated [its] understanding of plea bargaining as a complex tradeoff of risks.  In *Premo v. Moore*[, 562 U.S. 115 (2011)], the Court recently rejected a habeas challenge to a defense lawyer's advice to take a quick plea bargain.  Justice Kennedy's opinion for the Court rightly stressed that "[p]lea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks."  [*Id.* at 124.]  Parties reasonably trade that uncertainty for substantial discounts, to purchase finality, even as they know that their and the other side's evidence may wax or wane.  [*Id.* at 124-125.]  . . . Thus, the early signs are that *Padilla* was not a one-off decision but may have heralded the dawn of a new era.

Stephanos Bibas, *Regulating the Plea-Bargaining Market: From Caveat Emptor to Consumer Protection*, 99 Cal. L. Rev. 1117, 1138-1139 (2011).

Professor Bibas's prediction was born out in two subsequent decisions, *Missouri v. Frye*, 132 S. Ct. 1399 (2012), and *Lafler v. Cooper*, 132 S. Ct. 1376 (2012), both authored by Justice Kennedy.  In *Lafler v. Cooper*, respondent Cooper was charged with four counts under Michigan state law, including assault with intent to murder.  On two occasions, the prosecution offered to dismiss two of the counts and recommend a sentence of 51 to 85 months in exchange for a guilty plea.  In a communication to the

3

court, respondent admitted guilt and expressed his intent to accept the offer. However, on the erroneous advice of counsel that the prosecution would be unable to prove an intent to murder because the victim had been shot below the waist, Cooper rejected the plea deal. Cooper was convicted by a jury and sentenced to a mandatory minimum of 185 to 360 months' imprisonment. He then sought post-conviction relief on the basis of ineffective assistance of counsel.

In affirming the Sixth Circuit's grant of habeas corpus, the Supreme Court rejected the government's contention that "[a] fair trial wipes clean any deficient performance by defense counsel during plea bargaining," *id.* at 1388, and confirmed that "'the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel.'" *Id.* at 1384, quoting *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). The parties having agreed that counsel's advice regarding the plea agreement was deficient, the Court set out the standard for establishing prejudice under the circumstances:

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction

> or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id.* at 1385.

The Court also affirmed the Sixth Circuit's order of specific performance of the original plea agreement. Since the goal of a remedy is to "'neutralize the taint' of a constitutional violation," *id.* at 1388, it is within the discretion of the district court to "determin[e] whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between," or if resentencing is infeasible, "require the prosecution to reoffer the plea proposal." *Id.* at 1389.

In the companion case decided on the same day, *Missouri v. Frye*, respondent Frye sought habeas relief because his attorney had failed to communicate to him a favorable written offer made by the prosecutors to reduce a felony driving with a revoked license charge to a misdemeanor with a recommendation of a 90-day sentence. The plea offer expired, Frye ultimately pled guilty without an agreement, and was sentenced to three years in prison. Frye also sought post-conviction relief on the basis of ineffective assistance of counsel during the plea process.

The Supreme Court held that, given the prevalence of plea bargaining and its central role in the criminal justice system,

> as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused. Any exceptions to that rule need not be explored here, for the offer was a formal one with a fixed expiration date. When defense counsel allowed the offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires.

132 S. Ct. at 1408.

Although the Court accepted the lower court's findings that Frye's attorney was deficient in failing to communicate to him the favorable offer and that Frye would have accepted the offer had he been made aware of it, the Court remanded the case to the Missouri Court of Appeals to evaluate whether there was a reasonable probability that the prosecution would not have cancelled the agreement and whether the trial court would have accepted the agreement.

> First, the fact of a formal offer means that its terms and its processing can be documented so that what took place in the negotiation process becomes more clear if some later inquiry turns on the conduct of earlier pretrial negotiations. Second, States may elect to follow rules that all offers must be in writing, again to ensure against later misunderstandings or fabricated charges. *See* N.J. Ct. Rule 3:9–1(b) (2012) ("Any plea offer to be made by the prosecutor shall be in writing and forwarded to the defendant's attorney"). Third, formal offers can be made

part of the record at any subsequent plea proceeding or before a trial on the merits, all to ensure that a defendant has been fully advised before those further proceedings commence.

*Id.* at 1409.[4]

WILLIAM MERLINO'S CASE: BACKGROUND

By way of background, the court sets out the facts of the underlying case as they were explained in the court's March 4, 2005 opinion denying the motions for a new trial of co-defendants David Turner, Carmello Merlino, and Stephen Rossetti.[5]

> In the fall of 2001, after a month-long jury trial, defendant David Turner, together with codefendants Carmello Merlino, Merlino's nephew William Merlino, and Stephen Rossetti, were convicted of conspiring to violate the Hobbs Act in connection with the attempted robbery of a Loomis Fargo armored car facility in Easton, Massachusetts. The defendants were also convicted of various firearms offenses, the most serious of which involved the possession of a live hand grenade. . . .
>
> While the trial was lengthy, the essentials of the case . . . can be sketched briefly as follows. [Carmello] Merlino, who over several decades had earned a reputation as a professional criminal, had become a "person of interest to the FBI" in the March 18, 1990 theft of thirteen old master paintings from the Isabella Stewart Gardner Museum in Boston. David Turner, an understudy of Merlino's, was also suspected of having played a part in the robbery. [Carmello] Merlino, who was obsessed

---

[4] In the court's experience, this last suggestion has been taken to heart by federal prosecutors, thus substantially lessening the probability of a future recurrence of a case like Merlino's.

[5] Footnotes have been deleted from the text.

with the $5 million reward that had been offered for the return of the paintings, let it be known that he had access, if not to the paintings, at least to the persons who did. Among those in whom he confided was Anthony Romano, a former prison acquaintance for whom he had obtained a job at TRC Auto Electric (TRC) in Dorchester, where [Carmello] Merlino was employed. Unbeknownst to Merlino, Romano was simultaneously working as an informant for the FBI.

How Romano became leagued with the FBI is of some significance . . . . In 1996, while still in prison, Romano contacted FBI Special Agent David Nadolski with information regarding the theft of antique books from the John Quincy Adams Library in Quincy, Massachusetts. The tip eventually led to the conviction of the thief and the recovery of the books. In August of 1997, Romano provided Nadolski with information regarding the Gardner Museum robbery (the information did not implicate either [Carmello] Merlino or Turner). In the fall of 1997, after Romano was released on parole, Nadolski introduced him to Special Agent Neil Cronin, who was then handling the investigation into the Gardner robbery. Romano told Cronin that he believed that Merlino, and possibly Turner, had been involved in the theft of the paintings. He also explained that he had a job working with Merlino at TRC. Cronin asked Romano to "keep his ears open." He also asked him to report any meetings between Merlino and Turner at TRC.

Towards the end of October of 1997, Romano informed Nadolski that [Carmello] Merlino had broached the idea of robbing the Loomis Fargo facility in Easton and had asked Romano to recruit an "insider" to facilitate the scheme. Romano testified that the robbery was a recurring topic of conversation with [Carmello] Merlino during the ensuing year. Romano also continued to feed underworld gossip to Cronin regarding the Gardner Museum robbery. In November of 1998, as [Carmello] Merlino's interest in the Loomis Fargo robbery appeared to grow, Romano agreed to become an "enrolled" FBI informant and to secretly record his conversations with Merlino.

He also agreed to Nadolski's suggestion that he feign a connection with an "insider" employee at Loomis Fargo. Over the next two months, Romano recorded some eighteen conversations, mostly with [Carmello] Merlino. The recordings were damning. In broad detail, as Merlino refined the plans for the robbery, he discussed the size of the "crew" that would be needed (Merlino thought at least four to "carry the bags"), the need to acquire stolen cars and license plates (car theft was apparently one of Romano's specialties), the pros and cons of taking the Loomis Fargo guards hostage, and the protocols involved in splitting the proceeds of the robbery. On December 1, 1998, Merlino brought up the subject of guns, which he later expanded to include machine guns and grenades. On December 13, 1998, after having discussed the merits and shortcomings of various candidates, Merlino told Romano that he had settled on Turner and Rossetti. On January 6, 1999, Merlino reported that Turner, who had been incommunicado during the previous month, had finally returned his telephone calls. He also told Romano that he and Turner had "cased" the Loomis Fargo facility together in early 1998. Planning continued over the next month, culminating in a pre-robbery meeting of all four defendants and Romano at a restaurant in Dorchester. On February 7, 1999, the appointed day, the defendants were arrested as they converged on TRC, the designated assembly point. Among the items recovered from a car driven by Turner and Rossetti were ski masks, a police scanner, a "clean" cellular telephone, five hand guns, a rifle, and a fully armed fragmentation grenade.

To more fully explain William Merlino's participation in the crime, I turn to the court's March 7, 2002, order entering a judgment of acquittal on the hand grenade count of the indictment.

> This motion raises a troubling issue. The only evidence that William Merlino was aware that hand grenades would be used in the commission of the robbery came from Romano's testimony

9

about the January 28, 1999 planning meeting.  To place the testimony in context, it is important to understand some aspects of William Merlino's background.   William Merlino is Carmello Merlino's nephew.  He is a recovering heroin addict with a record of petty crimes, mostly involving theft, that are consistent with the profile of an inveterate drug user.  Unlike the other defendants, William Merlino had no involvement in the hardened crimes of his uncle's usual criminal associates.  By all accounts, he was deeply affected by the recent death of his wife and was peculiarly susceptible to the influence of his domineering uncle.  His role in the conspiracy was essentially that of a gopher.  Indeed, on the night of the critical meeting, William Merlino was sent out from time to time to collect accessories (hockey bags and masks) to be used in the robbery.

The critical testimony consists of the following exchange between Romano and the Assistant United States Attorney [James Lang] regarding the conspirators' meeting on the night before the robbery.

> Q. During that discussion [of the final plan], were there any periods of time when any of those four individuals left the room?
>
> A. We were separated in the building for a while.
>
> Q. Was that before or after the discussion about the final plan?
>
> A. Both times.
>
> Q. During the time – at the end when you were discussing the weapons, the equipment, the plan in terms of where people were going to go when, were there any periods of time when any of the four people left the group?
>
> A. I don't recall. I think we split up a couple of times.

> Q. During the discussion of the plan when Stephen Rossetti told the group that he had guns and grenades, who else was present in the room at that time?
>
> A. Everybody was there.

As William Merlino's counsel [Peter Parker] succinctly states: "Three decades in jail ride on those three words." It is, of course, a long-standing rule that a conviction can rest on the uncorroborated word of an informant witness, so long as the jury is fully apprized of any agreements that he has reached with the government, and so long as the court gives "complete and correct instructions detailing the special care the jury should take in assessing the testimony of the [informant]." *United States v. Ortiz–Arrigoitia,* 996 F.2d 436, 438–439 (1st Cir. 1993). All of that was done here, and in a purely legal sense, the verdict is unimpeachable. I have no particular reason to believe that Romano's testimony did not reflect his best efforts to accurately remember who was present when the critical words were spoken by Rossetti, nor do I doubt the credibility of his testimony on other important aspects of the case. Nonetheless, given Romano's admitted lapses of memory, and the lack of any contemporary documentation or other corroborating evidence of his testimony on this point, I am left with the nagging conviction that the unadorned statement "Everybody was there" is too slender a reed to support the mandatory thirty year consecutive sentence that the law otherwise requires as an addition to the substantial punishment that William Merlino will almost certainly receive.

## PLEA BARGAINING AND WILLIAM MERLINO'S CASE

The issue in Merlino's case is, as the court framed it: "[W]hat constitutes a formal offer of a plea and the extent to which the use of that phrase . . . was meant by the Supreme Court . . . to have some kind of

operative or decisional significance." Jan. 14, 2014 Hrg. Tr. at 4. This is not the first court to consider the invitation extended to lower courts by *Lafler* and *Frye* to develop a body of law fleshing out rules to govern the modern plea bargaining regime. The consensus reached to date by courts on the subject of plea bargaining is nicely summarized by Judge Thompson in *Herrera-Genao v. United States*, C.A. 12-6119, 2014 WL 6386807 (D.N.J. Nov. 14, 2014).

> The existence of a plea offer is a factual determination. *See Guerrero v. United States,* 383 F.3d 409, 417 (6th Cir. 2004). Plea offers are examined under the same standards as other contracts. *Puckett v. United States,* 556 U.S. 129, 137 (2009); *United States v. Moscahlaidis,* 868 F.2d 1357 (3d Cir. 1989); *United States v. Odachyan,* No. 11-50253, 2014 WL 1491885 (9th Cir. Apr. 17, 2014). Plea offers, like other contract offers, may be made orally. *United States v. Sanchez,* 562 F.3d 275, 280 (3d Cir. 2009) (overruled on other grounds) ("Just as contracts are not invalid simply because they are made orally, the same is true of plea agreements."); *Brown v. Poole,* 337 F.3d 1155, 1159 (9th Cir. 2003) ("The terms of oral plea agreements are enforceable").

*Herrera-Genao*, at *8 (footnote omitted); *see also Overstreet v. Wilson,* 686 F.3d 404, 407 (7th Cir. 2012) ("[W]e assume, again without deciding, that counsel's duty to communicate potential bargains to their clients covers oral offers").[6]

---

[6] As Judge Thompson observed, the Supreme Court's language in *Frye* "suggests that formal offers can be oral and that the Court did not find

FINDINGS OF FACT

The court makes the following findings of fact based on the credible testimony presented at the court's October 24, 2014 evidentiary hearing.

1. James Lang was the principal Assistant U.S. Attorney assigned to the trial of the Merlino case. Lang was an experienced prosecutor with nearly eight years of service in the U.S. Attorney's Office at the time of the trial. Prior to that, he had served seven years as an Assistant District Attorney in the Commonwealth of Massachusetts. After serving in supervisory positions in the U.S. Attorney's Office, in 2013, he became a Justice of the Massachusetts Superior Court.

2. The practice of the U.S. Attorney's Office in 2001 was to memorialize plea agreements in writing for the approval of a Unit Chief (in Lang's case, the Chief of Major Crimes) and the head or deputy head of the Criminal Division. Line Assistants had the authority to initiate and conduct plea discussions and to make recommendations regarding the disposition of their cases. These recommendations, at least in the instance of experienced Assistants, were almost invariably followed at the supervisory level of the U.S. Attorney's Office. Lang's practice in doubtful

---

a relevant distinction between oral and written offers." *Herrera-Genao*, 2014 WL 6386807, at *8 n.5. *See Frye*, 132 S. Ct. at 1409 ("States *may* elect to follow rules that all offers must be in writing." (emphasis added)).

cases was to make a verbal overture about a defendant's receptiveness to a plea offer with his counsel and only begin reducing the offer to writing if the defendant (through counsel) expressed a willingness to plead.

3. Peter Parker, at the time a member of the Federal Defender's Office, represented William Merlino at trial. Parker was an experienced defense lawyer, having worked as an associate at the Boston law firm Mintz Levin handling criminal defense matters and as an Assistant Federal Defender, for a total of 13 years of defense work prior to Merlino's trial.

4. In Lang's view, William Merlino was the only one of the four defendants for whom he believed a plea offer was appropriate. As he testified at the hearing,

> I viewed him as the least culpable of the . . . four defendants. He was the nephew of the principal, Carmello Merlino, and had been brought into this scheme by his uncle. Although he was a career offender based on his prior criminal record, my examination of his record, when compared to both the records of the codefendants and the information we had about their criminal activities that may have gone beyond what was reflected in their criminal records, indicated to me that Mr. William Merlino was not in the same league in terms of the type of criminal conduct in which he had engaged as the other three. So I didn't view his background of criminal conduct to be nearly as egregious as that of the other three codefendants.

Oct. 24, 2014 Hrg. Tr. at 23.

5. Consistent with his view of Merlino's involvement in the case,

Lang made an overture to Parker in August of 2001, several weeks prior to trial, outlining the government's proposal to dismiss the hand grenade count with its 30-year mandatory sentence in exchange for a plea to the remaining counts with no departure below the minimum of the applicable Sentencing Guidelines. Parker's response was to laugh and ask why Merlino would do such a thing. Lang explained that Merlino's chance of conviction on all but the hand grenade count was extremely high and even were he to be acquitted on that count he would be looking at a sentence of 21 years (as opposed to 40-50 years were he to be convicted on all counts). The plea offer, on the other hand, proposed a recommended sentence of 17 years total.

6. Parker testified that he had no independent memory of Lang's offer, but that he had eventually located his case file in storage, and had found notes of a telephone conversation with Lang on August 23, 2001, confirming Lang's recollection of the outlines of the offer. Parker has no recollection of any discussion of the offer with Merlino, nor is any discussion in his file of the case

7. Lang also recalled a conversation with Parker some years later, after the *Lafler* and *Frye* decisions had been handed down. Parker told

Lang that Merlino had called and asked him about the Supreme Court decisions and whether the government had ever made an offer in his case. Parker asked Lang whether he had any recollection of a plea offer. Lang confirmed that Merlino was the only defendant to whom an offer had been made.

8. While Lang would not characterize the offer as binding, he was committed to advocate for it (had Merlino accepted), and was confident that it would have been approved by James Farmer, then the head of the Criminal Division and Acting U.S. Attorney.[7]

9. I credit Merlino's testimony that Lang's offer was never conveyed to him. While I recognize the temptation to a defendant to offer self-serving testimony on an issue like this, I found Mr. Merlino's denials of being told of the plea offer credible and corroborated by the nature of his initial inquiry to Parker after learning of the *Lafler* and *Frye* decisions, as well as by the absence of any record of such a conversation in Parker's file contrary to his usual practice. I also credit Merlino's testimony that he would have accepted the 211-month (17 year) sentence had it been

---

[7] Michael Sullivan, the newly appointed U.S. Attorney, who took a rigid view of plea bargaining, especially if a mandatory sentence was involved, was not sworn in until September 19, 2001, nearly a month after the plea offer was extended to Merlino through Parker.

presented to him. I do so not only because I believe his testimony in this regard and because it is consistent with the disposition Merlino accepted in every one of his prior criminal cases.

## ULTIMATE RULINGS OF FACT AND LAW

1. To be enforceable, "[a]ll the essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined." *Cygan v. Megathlin*, 326 Mass. 732, 733-734 (1951). This is true of oral as well as written contracts. *See Simons v. Am. Dry Ginger Ale Co.*, 335 Mass. 521, 525 (1957).

2. The oral plea offer extended by Lang contained all of the necessary elements of enforceability. It specified the count of the indictment to be dismissed, the counts to which Merlino would plea guilty, the guidelines sentencing range to be applied, and the foreclosing of any arguments for a departure under the guidelines.

3. Parker accurately took notes of the terms of the offer, but never communicated the offer to Merlino. The failure to do so constituted ineffective assistance of counsel. *Frye*, 132 S. Ct. at 1408.

4. Had William Merlino been informed of the plea offer, he would

have accepted it on the terms offered by Lang.  Moreover, had he accepted, the plea agreement would have been approved by James Farmer, Lang's then ultimate superior.

5. Had the plea agreement been presented to this court prior to trial, it would have been accepted.

6. The loss of the opportunity to plead guilty prejudiced Merlino by causing him to receive a sentence far more severe than would have otherwise been the case.

7. Based on the precision of Justice Lang's testimony, the corroborating notes of Mr. Parker, and the credibility of William Merlino's testimony in its relevant respects, there is no danger in this case of the "late, frivolous, or fabricated claims . . . after a trial leading to a conviction with resulting harsh consequences," of the kind warned against by the Supreme Court in cautioning that a plea offer to be enforceable must reach a level of formality "in the sense that its terms and its processing can be documented . . . if some later inquiry turns on the conduct of earlier pretrial negotiations."  *Frye*, 132 S. Ct. at 1408-1409.

## CONCLUSION

William Merlino has now (with a brief interval) served some

seventeen years in prison, the term contemplated in the unconveyed plea offer, and one that the court believed then (and now) appropriate given his significantly lesser role in a crime planned and masterminded by far more hardened criminals than he.  He has paid his debt to society, and justice demands no more.

## ORDER

For the foregoing reasons, Merlino's motion to vacate, set aside, or correct his sentence is <u>ALLOWED</u>.  The U.S. Attorney's Office is <u>ORDERED</u> to extend to Merlino an offer to plead guilty on the terms proposed by (then) Assistant U.S. Attorney Lang in August of 2001.  The Clerk will consult with the U.S. Attorney's Office and Merlino's counsel to establish a mutually agreeable date for a resentencing.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE